Good morning, Your Honors. Michelle Anderson on behalf of Mr. Munoz. Mr. Munoz's conviction should be reversed for several reasons today, and what I'd like to highlight today is the prosecutorial misconduct that occurred in his case, the violations of Brady v. Maryland, and the ineffective assistance of counsel he received at sentencing. The prosecutor in this case committed misconduct before, during, and after the trial in this case, and I think the clearest example of this is misconduct was when Mr. Shane Woodland, the government's star witness, testified falsely during trial, and then the government vouched for his veracity in closing argument. Now, Mr. Woodland, when he testified, he created the impression that he had implicated Mr. Munoz from the very beginning of his cooperation efforts. Let me ask you something. I follow your argument, but I don't understand exactly where it leads, because let's suppose the government should have stepped up to the plate. The minute Woodland testified that he saw Loya hand over cocaine to Munoz and say, wait a minute, that's inconsistent with what he told us in proper session number two. If it should have done that, what difference would it have made, because that came out, that is, the two agents who were at the other end of the proper sessions, testified to the reality that he did say one thing at one time and another thing at another time? Well, I disagree with the proposition that it came out, because what happened after he testified falsely, and the defense attorney was in the position of having to help. Well, he testified inconsistently with, I mean, he said both sides. He said I saw it. He said I didn't see it, and he said I saw it. I don't know which one's false, actually, but he did testify totally inconsistently. But the agent who was at the other end of the conversation brought that out. Well, I disagree that he didn't testify falsely, and the government concedes in its brief that he did testify falsely. But Your Honor's point is, wasn't that impeachment sufficient to demonstrate that Mr. Woodland had indeed lied on that point? And I don't think that's true based on this record, because what happened during cross-examination is the agents admitted those points, but then when the government, I'm sorry, direct examination, and then when the government had the opportunity to cross-examine his own leading agents in this case, he muddied the waters. He didn't allow the impeachment to stand. What he did was he created the idea that Woodland had been consistent all along, and that was the point of his redirect examination. Okay, but what could have been different? That's what I'm just trying to get you to help me with. I mean, what would you have had happen? I would have had the government first and foremost hand over all the impeachment information they had about Woodland in the first place. Well, they didn't happen until he testified. That's the point. The only thing that happened is that there was an inconsistency or a falsehood to give you the benefit of that, but it happened at trial. So I don't understand what could happen pretrial when it doesn't happen until trial. Well, the importance of what happened pretrial is sort of interrelated with another issue, which is the government's overall pattern of late and incomplete disclosure in this case. That doesn't answer the question. What specifically should the government have given you and when that you did not receive, in your view, in a timely manner? Well, I think that that's kind of a long answer to that question. First, they should have given me – well, I wasn't a trial counsel. You're a client. The government should have handed over the complete statements from the third procession. Well, there wasn't any report. I mean, they called immediately to counsel, caught him in his car coming back from Arizona, and told him the key favorable thing that Woodford had said, Woodland had said. I disagree that they turned over the key favorable thing that Woodland had said. What Woodland had said was not only that he had seen this cocaine transaction, but he actually said he met Mr. Woodland – I'm sorry, met Mr. Munoz, my client. He also said that at that time he had a conversation with Mr. Munoz, where Mr. Munoz introduced himself to Mr. Woodland as his banker. All of that was saved for the direct examination. They were relevant and important. And the government purposely left that out of that cell phone disclosure that you mentioned. Is relevant and important Brady material? Well, it's impeachment material, certainly. And what we're talking about right now is the impeachment of Mr. Woodland at the trial. Yeah. The Brady issue, of course, is also part of the misconduct in this case. And had the government ferreted out all favorable information, that would have been – Does Brady require them to ferret it out or just to turn over what they actually know? Well, there's an affirmative duty by the government when they use a cooperating witness at trial to ferret out, to look for any favorable information that might be helpful to the defense in the category of impeachment or in – What case stands for that property? Bernal Obeso. U.S. v. Bernal Obeso. I mean, any information that the government has, it is included within its obligation. But I understood you to be making an argument that beyond that, they had some kind of duty to go investigate. Well, I think they do have the duty to investigate when they use a confidential informant and they're on notice that that confidential informant has veracity problems. And in this case, Mr. Woodland had veracity problems both internally in the stories he told from one day to the next to the government, which are opposed to one another. Okay. And secondly, in their unwillingness to ferret out the information with respect to Mr. Loya. Now, we talked a little bit about the Brady information that came out after the conviction in this case. After the conviction in this case, the government met with Mr. Loya. And Mr. Loya said, you know what? Mr. Woodland didn't tell the truth. I never gave Mr. Munoz cocaine. That meeting happened after the conviction in this case, but before Mr. Munoz was sentenced. And the government didn't tell Mr. Munoz then. They didn't tell Mr. Munoz when he filed the objections to the pre-sentence report where he challenged Mr. Woodland's veracity. They didn't tell him about that meeting then. It was produced before sentencing. And the last two proffers from Loya were produced before the time for making a Rule 33 motion will have expired, because it still hasn't.  So you've got gobs of time to make use of it. Well, and I have made use of it. There is a motion for new trial now pending before the district court. But I – There is? There is not. It was filed last week. Okay. Because it doesn't show up on PACER. Well, it was filed under SEAL.  And so the district court signs off on the order. It probably won't show up on PACER. But, yes, it was filed in district court. But the basis upon which you can raise a Rule 33 motion are only based on newly discovered evidence. Which this isn't. Well, this is. But the claims of prosecutorial misconduct, ineffective assistance of counsel, I think, are properly brought here. I also think there is enough on this record to find that Brady was violated and is reversible. However, if the Court disagrees with that, I would urge the Court to wait on those particular issues. Now, when we're talking about – To do what with those issues? I'm sorry. I didn't understand what you were asking us to do. I said that, Your Honor, if the Court is not inclined to find that Brady was violated based on the record before it, then I would ask the Court to wait to make a determination on that particular issue. Wait for what? Do you want us to defer submission until the district court has ruled on the new trial motion? Or what is it specifically you would like us to do? Exactly that, but only with respect to the Brady violations. With respect to the other claims, for example, the prosecutorial misconduct claims and the ineffective assistance of counsel, both those claims give this Court the opportunity to decide those matters. If you're inclined to reverse on those bases, then I ask you to save us the time and trouble in district court because that's another avenue of reversal in this case. Now, I think that this pattern of late and incomplete disclosure by the prosecutor for tactical gain is well established in the briefs, both during the district court proceedings and after the appeal began in this case. We had the intentional delay, and the government doesn't argue in its brief that it's Brady delay, that disclosing that Brady information was anything but knowing and purposeful. And they disclosed it at a time when the defendant was not at – could not fully take advantage of it. And they didn't disclose the entire thing. The Brady statements included two things. One, that Mr. Loya said that he never gave cocaine to Mr. Munoz. But it also included that Mr. Loya said that he knew independently about the $10,000 cash reporting requirements. That didn't come out because the government never turned over those notes. And that statement wasn't learned until counsel found it in the notes in August of this last year. Now, when I was seeking outstanding Brady, the government didn't volunteer to me that it had had two additional meetings with Mr. Loya where he gave substantial information to corroborate these claims. They don't argue that those actions were anything but knowing and purposeful. Now, we have it in our hands, and we can see that this information is substantial. So based on the information that has been turned over, the fact that the jury relied on Mr. Woodland in arriving at a verdict, this was what the district court found and what the prosecutor argued. He suffered prejudice.  Kagan. Can I ask you a question on the prejudice issue? The most important thing is that the so-called Brady material would have brought out is inconsistency as to whether Loya gave Munoz cocaine. And my question is, why is that material? Because it only goes to motive. Why isn't it just simply impeachment on a collateral issue? Motive doesn't make any difference one way or the other. It's not an element of the offense. Well, I think, Your Honor, that argument, and that's an argument that the government advances in its brief, was flatly rejected by Brown v. Borg. The government made motive part of this trial. They argued that was their theory of the case, that Edward Munoz committed these crimes for cocaine payment. They argued it an opening. It was the central part of their case in chief. And they argued it over and over and over again in closing arguments. So even when motive isn't an element per se, the government used it to convince the jurors of those elements. And, again, the case is Brown v. Borg, and it wasn't distinguished by the government in its brief. And what I'd like to do, unless the Court has any additional questions at this point, is reserve my remaining time for rebuttal. May it please the Court. Peter Hernandez on behalf of the United States. Your Honor, defendant's structuring conviction should be affirmed. This was a conspiracy to structure cash into an account controlled by lawyer and Woodman. There was evidence in the form of intercepted conversations,   between Loya and Munoz regarding the depositing of cash in different amounts on different days. There were bank records showing over $102,000 in cash that was deposited into those accounts. But the – so that's his – that's Mr. Munoz's structuring conviction. But with regards to the Brady issue, Your Honor, in terms of Loya, as an initial matter, the statement that Loya made to the government that he didn't provide drugs to Munoz was provided to him after trial. This was something that occurred in March 1st. The defendant was convicted in January. Defendant's sentencing was in April. Should it have been provided – should that statement have been provided immediately after March 1st? Certainly it should have, Your Honor, and that was something that the government failed in terms of providing it sooner. But nevertheless, it provided it prior to defendant's sentencing. And defendant used that statement to try and object to certain things that were in the pretrial – in the presentence report. It used it. Judge Morrow considered it and was aware of the disclosure made at defendant's sentencing. I do want to stress to the Court that there were no attempts by the government at any time during these proceedings to suppress any of the statements. There's a innuendo in the briefs that somehow the government knew what Loya was going to say about providing drugs to Mr. Munoz. That was certainly not the case, and it hasn't been the case, and it was not the case. I just want to make that clear. Now that this information is known and it does seem material to the credibility of the witnesses at a minimum, what is the government's position about the motion for a new trial? Your Honor, I think the motion of a new trial, which I didn't see as of last week, will be filed. The government intends to respond that whatever Loya's statements are are not credible based on the testimony of Mr. Woodland, based on the statements that Woodland has given, and based on the totality of the statements given by Mr. Loya. So it's your position that Woodland is telling the truth and that Loya is lying? That's correct, Your Honor. Now, in that regard, I have some concern about something that hasn't been discussed in the opening part of the argument, and that is the closing argument, in which at page 204, line 19, the argument is Mr. Woodland could have come up with all sorts of stories that would have made our job a lot easier, but he didn't because he's telling the truth. Is that impermissible in vouching? Your Honor, I think if we had to do it all over again, I think it would have been crafted in a much different way. Well, it wasn't. So what do we do with it? Well, I think to some extent, the Court should review it under a plain error standard. It should look at the entire context of the argument. That piece of evidence or that piece of argument was to rebut counsel's closing argument in which, for the most part, he called Mr. Woodland. As you say, that can be crafted in a different way to say how likely is it, given the other evidence, how, Julie, should you weigh the credibility in this circumstance? But to just flat-out say he's telling the truth, that seems pretty starkly improper. Your Honor, I would say, yeah, I believe the Court is right. It was something that the government, on further reflection, shouldn't have used. But I don't necessarily think that it's something that should allow for the conviction to be reversed. Again, the government saying he's telling the truth, but that's in the context of what counsel was arguing. What's our standard of review? I know it's for plain error, but what do the cases on vouching say? How much prejudice need be shown in the context of vouching? Well, I think it depends on what the other evidence is, Your Honor. If the linchpin, if the crux of this case — What do the case — what do our cases say about how we examine that issue? Well, I think the cases provide that, in terms of looking at this particular case, the Court has to look at the entire record, has to look at the evidence that was presented. Obviously, I think if Mr. Woodland was the crux of this particular case, if it was — if the government was putting, if I can say this, all its marbles in Mr. Woodland, then I think it becomes a different type of case, a much more perplexing case. But in this particular case, given that the conviction was unstructured and given that we had intercepted conversations, given that Mr. Woodland's bank records to show that Mr. Munoz was structuring — was structuring that he was convicted of structuring, I think that the Court should look at that in way or in reviewing the plain error that occurred. I would like to point out to the Court the Necochea statement in which the — It's a brilliant opinion. It is a brilliant opinion, Your Honor. In which the Court allowed the statement, I submit he is telling the truth. The only difference between, I believe, this case here and that case is the word submit. Should have the word submit be used? It should have. It didn't, Your Honor, but that doesn't necessarily negate the conviction in this particular case. With regards to the statements, Mr. Woodland's statements, Your Honor, let's just be clear. There were three statements of Mr. Woodland that were produced to counsel, July 05, December 06, January 07. The statements regarding July 05, there was some discussion regarding the cross-examination by defense counsel in terms of whether or not Mr. Munoz's name was mentioned. That got clarified at the cross-examination stage when, at a certain point in time, Mr. Woodland initially said he had mentioned Munoz's name and then eventually said he didn't remember. With regards to the second issue, the second statement as to whether or not he saw Mr. Munoz get cocaine by Mr. Loya, there was some mix-up there in terms of the dates when, in fact, when Mr. Woodland told us that was in January 07, the record states and the government didn't fix it that it was in December of 06. Nevertheless, Your Honor, that clarification was made on both points, for the July 05 statement as well as for the December 06 statement. Agent Castro and Agent Torres testified that, in fact, Mr. Woodland did not say certain things on a particular date. He didn't mention anything about Mr. Munoz in July of 05, and he certainly didn't mention that he actually saw Mr. Munoz receive cocaine from Mr. Loya in December of 05. He actually made that statement in January of 06. Those statements, Your Honor, were produced to counsel. Counsel had the ability and certainly effectively cross-examined Mr. Woodland on those points. So in terms of whether or not there's plain error, there is no plain error. The record was corrected. With regards to whether or not Mr. Woodland's veracity should have been verified, I believe the government did that, Your Honor. In terms of the initial statement in December of 05, Mr. Woodland tells the government that he did see an individual who he believed was Mr. Munoz arrive in a white BMW. At that point, he didn't necessarily say that that was Mr. Munoz. He said it subsequent to that period of time. Now, at trial, the government cross-examined Mr. Munoz and verified and determined that, in fact, Mr. Munoz reluctantly admitted that he was driving a white BMW. That goes to the verification, so to speak, of Mr. Woodland being truthful in terms of the statements that he made. Your Honor, with regards to the ineffective assistance of counsel claim, the government does believe that in this particular case, given the record that it has, it's certainly undeveloped in terms of whether or not this Court has enough facts before it to determine that the defense counsel in this case was ineffective. Clearly, if one reads the cross-examination of Mr. Woodland, the defense counsel was clearly effective in terms of bringing out points, casting doubt on the credibility of Mr. Woodland. And to some extent, one can argue, Your Honor, that based on his cross-examination of Mr. Woodland, the jury was unable to find Mr. Munoz guilty on the money laundering count. So in terms of what the record is before the Court as of today, I think that that's an issue that needs further development at the district court level before the Court really has a chance to review all the facts before it can determine whether defense counsel was ineffective. If the Court has any questions. Yes. Yeah. I do have one sort of procedural question. Now that a motion for new trial has been filed, what is your thought with respect to what we should do? That is, one option is just go full steam ahead and decide this appeal. Another is to, in fact, do a limited remand to give the district court an opportunity to resolve the motion for a new trial. Do you have a view? I have a view with regards to the Brady violation. Your Honor, in terms of the Boston's conduct and the other claims, I think the Court has enough before it to go forward. I'm not suggesting that that would be a reason not to go forward, but just rather sort of a prudential reason. I think with regards to the Brady claim, Your Honor, while there has been some filings and some information before the district court, I think the district court is in a better position to develop the record to show the Court that certainly there wasn't any Brady violation. I think the court, the district court, the government would, you know, would suggest that the district court be allowed to evaluate all the issues, given some of the accusations that have been raised in this particular issue. Well, the district court is clearly in a better position than we are. I mean, to do that, I mean, she sat through the whole proceedings and has a much, you know, closer sense of everything that happened. I agree, Your Honor. And I think to some extent, if the Court is inclined, that Brady issue should be deferred back down to the district court so the district court can develop fully the record so the government can have an opportunity to challenge some of the accusations that have been raised in this Brady and to have the court fully decide those issues. Okay. Anything further? No. Anything?  All right. Thank you, Mr. Hernandez. Ms. Anderson. Thank you. Answer to the same question? Well, I do think there is enough before this Court to reverse on Brady, even on a plain error review. And if this Court doesn't – isn't convinced, then I would want this Court to wait on that and remand for that reason. But the only reason that I think that it's true is because I – we have substantial new evidence that we presented to the district court in our filing on the Brady issue, which I think strengthens those arguments. You asked earlier what the standard of review is for vouching. And the standard is the Court requires that it must determine whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the proceedings. Well, that's what – that's if there's an objection. Here there was no objection, so the review would be for plain error. And that's what the government argues on appeal, and they point to Ali for that proposition. And I agree there was no objection, so – but I think that even under a plain error standard, the error was plain. Ali actually, though, ultimately supports the defendant's argument. In Ali, the defendant had full impeachment in writing before trial, knew the full extent of the falsehoods when the witnesses lied. And the government didn't rely on that false testimony in its closing argument. In this case, the opposite is true. The government concedes that it didn't fully – it disclosed the full extent of Woodland's new statements to counsel, only told him about that one part that he saw the drug transaction through the window, left out the conversation with Munoz where he introduced himself. And they state all that for direct examination. So I don't think that the defendant should be prejudiced by a last-second disclosure like that. And that's a distinction that was recognized in Ali. Ali said had defense attorney not had impeachment pretrial, they said plain error would not apply. And they cite to Bluford another case by this Court which found that the government's mid-trial release of evidence did not give the defendant an opportunity to review and object, so no objection was required. And that's also, of course, codified in the Rules of Criminal Procedure, Rule 51. There's no opportunity to object. Then there's no prejudice to the party which claims error. So I don't think that plain error applies here. But even so, the error was plain. Kagan. Thank you. Okay. Thank you very much, counsel. Both of you. The matter just argued will be submitted. Okay. All right. And we'll mix to your argument in the Massad-Jackson, and I'm not going to try.
judges: Rymer, Graber, Bea